**AMERICAN FLINT GLASS WORKERS' UNION OF NORTH AMERICA et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Bartlett-Collins Company, Intervenor.**

**No. 12620.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 1, 1955.

Decided Jan. 30, 1956.

Bazelon, Circuit Judge, dissented.

Mr. Donald W. Fisher, of the bar of the Supreme Court of Ohio, Toledo, Ohio, pro hac vice, by special leave of court, with whom Messrs. Edward J. Hickey, Jr., and James L. Highsaw, Jr., Washington, D. C., were on the brief, for petitioner. Mr. Clarence M. Mulholland, Toledo, Ohio, also entered an appearance for petitioner.

Miss Fannie M. Boyls, of the bar of the Supreme Court of Texas, Washington, D. C., pro hac vice, by special leave of court, with whom Mr. Marcel Mallet-Prevost, Asst. General Counsel, and Mrs. Nancy M. Sherman, Washington, D. C., Attorney, were on the brief, for re-

spondent. Mr. Robert G. Johnson, Washington, D. C., Attorney, also entered an appearance for respondent.

Mr. Karl H. Mueller, Fort Worth, Tex., with whom Mr. Jesse R. Smith, Washington, D. C., was on the brief, for intervenor.

Before BAZELON, DANAHER and BASTIAN, Circuit Judges.

BASTIAN, Circuit Judge.

This case is before the court on petition for review or to modify an order of the National Labor Relations Board. The petitioners are American Flint Glass Workers' Union of North America (A. F. of L.) and twenty-five individuals, members of that union, formerly employed by the intervenor, Bartlett-Collins Company, of Sapulpa, Oklahoma.

The proceedings before the Board began with a complaint filed with the Board by its General Counsel, alleging that the company had engaged in unfair labor practices proscribed by § 8(a) (1) and (3) of the Labor-Management Relations Act of 1947, 29 U.S.C.A. § 158 (a) (1) and (3), by discriminatorily refusing to reinstate or reemploy the present petitioners, among others, following a strike.

The Board's Hearing Examiner found that the company had engaged in unfair labor practices, and recommended a cease and desist order, reinstatement of the petitioners in their former or substantially equivalent jobs, and back pay for all but two of the petitioners. The Board, in its order of October 19, 1954, the order appealed from, reversed the examiner's findings and found that, upon the whole record, the General Counsel had failed to establish, by a preponderance of the evidence, unfair labor practices as charged.

The issue presented by the petitioners for review is whether or not the Board's finding that the General Counsel had failed to sustain the burden of proof that the individual petitioners were refused reemployment for discriminatory reasons, in violation of § 8(a) (1) and

(3), is supported by the record considered as a whole.

We agree with the Board.

Prior to the strike hereinafter referred to, the company had recognized and bargained with the union for a number of years. Since 1915 it had dealt with the union regarding a unit of moldmakers and other skilled employees. Following an election in 1941 the company bargained with the union regarding a unit of miscellaneous production and maintenance employees. During negotiations for the contract in 1941 a strike was called, which resulted in a contract, following which the company reinstated all the strikers, including some of the individual petitioners in the instant proceeding. From 1941 to 1951 the company and the union maintained continuous contractual relations, including a check-off. No unfair labor practices are alleged or have been proved to have occurred during that period.

In January 1951 the union formally notified the company that as of March 7, 1951, it would terminate the current contract and that, unless a new contract was agreed upon, a strike would be called. Negotiations were not concluded and, on March 14, 1951, an economic strike was called. One hundred and seventy of approximately 460 employees in the production and maintenance unit participated, along with 11 moldmakers. By the end of the strike on March 29, 1951, all strikers had been replaced except those strikers who returned during the strike and the 11 moldmakers.

■ The picketing, which had been entirely peaceful, ceased on the morning of March 29 and a conference was had between representatives of the union and of the company at 2:00 P.M. of that day. The company's representative stated that the moldmakers, who were especially skilled workers, could return to work under the same conditions as prior to the strike, and this was done. In answer to a question as to whether or not the respondent would take back other strikers as soon as it could, the representative of the company stated that the company would put on these people when it could, that the company would do the best it could.[1] The union representative then advised the replaced strikers to make applications for reemployment. Many, in fact, had already done so upon removal of the picket line that morning.

About 100 strikers thereupon applied for reemployment, all but a few within a two and a half-week period. New applications for employment were not required as the old applications were on file, but the company placed their names on a separate list and informed them that they would be called in the event of an opening.

The examiner and the Board found that of the 170 strikers in the production and maintenance unit[2] 30 returned during the strike and 73 after the strike, this despite the fact that the company had restaffed its plant with new employees and the strikers who had returned during the strike. Thirty-eight of the remainder did not apply and asserted no claim to reemployment.

The rest included those named in the complaint and, of these, the trial examiner found that 25 had been discriminatorily refused reemployment. As evidence, the trial examiner reported that only two of the union officers and committeemen were reemployed and that a large majority of those named in the complaint, and who were not reemployed, had walked the picket line in the last two days of the strike.

As the Board points out, however, only four of the ten union officers and committeemen are named in the complaint. One of the remaining six did

1. Certainly the employer was not bound to discharge those hired to fill the places of the strikers. National Labor Relations Board v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 345–346, 58 S.Ct. 904, 82 L.Ed. 1381.

2. The 11 moldmakers were immediately reemployed.

not go out on strike, two returned to work during the strike, and the remaining three asserted no claim to reemployment. Of the four referred to by the examiner, three either specifically asked for their old jobs back (which had been filled at the time) or did not apply until five or more weeks after the strike.

Athough many of the complainants walked the picket line during the last two days of the strike, this was true also of a substantial number of strikers whom the company later reemployed.

The Board further found that the evidence was insufficient to support a finding of discriminatory motivation on the part of the respondent. It found that the respondent had a background free of unfair labor practices, that the great majority of the strikers who applied for reemployment were rehired, and that there had been no showing that any of the strikers who were also union members and had participated in picketing were discriminatorily treated after their return to work.

The company's position with reference to the claim that it failed to rehire certain of the strikers was that there were no positions available when the requests for employment were in an active status. It appears that the personnel manager of the company was personally and solely in charge of the hiring of personnel. It was the testimony of the personnel manager, and this is uncontradicted, that when employees were needed by the company they were needed at once and that, if any applicants were physically present in the personnel office when the need arose, they were usually hired on the spot. It was further testified that, due to the labor situation in Sapulpa, applicants for employment were generally not available for work after a week or two, as they had by that time ordinarily accepted other employment. It was also the testimony of the personnel manager that he had found it to be a waste of time to attempt to get in touch with applicants even a week after the applications were filed and that he ordinarily made no attempt to get in touch with any applicant for employment more than four weeks from the time the application was filed. He further testified that he did not handle the petitioners' applications any differently from those of new applicants.

It is of interest too that immediately after the strike the company was overstaffed, with an average employment of 511 compared to 461 before the strike. The uncontradicted testimony of the personnel manager was obviously believed by the Board and we cannot say that it was not justified in so doing.

The Board concluded that under all the circumstances, and upon the record as a whole, the General Counsel had failed, by a preponderance of the evidence, to sustain his burden of proof of discriminatory motivation.

██ Stress is laid by the petitioners upon the fact that the examiner's findings were reversed.[3]

The matter of the overruling of a trial examiner's findings by a Board was before the Supreme Court in Federal Communications Commission v. Allentown Broadcasting Co., 1955, 349 U.S. 358, 363–364, 75 S.Ct. 855, 859, 99 L.Ed. 1147, a case arising in this circuit. There the court said:

"In reaching its conclusion to set aside the Commission's order awarding the license to Easton, the Court of Appeals found that the Commission's reversal of its Hearing Examiner was erroneous. That court analyzed the evidence before

3. The petitioners claim: "The Board reversed the Trial Examiner's Intermediate Report in which, on the basis of the above facts, he found the Company guilty of illegal discrimination, but, yet, it failed to credit the Company with any valid reason for the non-employment of Petitioners. It, moreover, did not disagree with any of the major findings of fact by the Trial Examiner, and failed to make any additional findings of fact." (Petitioners' brief, pp. 15–16.)

the Commission as to Easton's uncertainty on affiliating with radio networks to secure their programs for its listeners, the reluctance, evasiveness and lack of candor of Easton's principal witnesses and the concentration of local communications media in the hands of the Easton applicant who was the publisher of the only local newspaper, the licensee of one of two FM radio stations and of the only television station. The court agreed with the Examiner and overruled the Commission. None of the above circumstances are in themselves a bar to the Commission's grant of license. Each involves appraisals of testimony that put into a record facts derived from various witnesses by interrogation. There was substantial evidence considering the whole record that had to be weighed, pro and con, as to types of programs, evasiveness of witnesses, and the desirability of allocating an additional license to an applicant who already controlled other means of communication.

"The Court of Appeals' conclusion of error as to evasiveness relies largely on its understanding that the Examiner's findings based on demeanor of a witness are not to be overruled by a Board without a ' "very substantial preponderance in the testimony as recorded," ' citing National Labor Relations Board v. Universal Camera Corp., 2 Cir., 190 F.2d 429, 430. We think this attitude goes too far. It seems to adopt for examiners of administrative agencies the 'clearly erroneous' rule of the Fed.Rules Civ.Proc., 52 (a), 28 U.S.C.A., applicable to courts. In Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 492, 71 S.Ct. 456, 467, 95 L.Ed. 456, we said, as to the Labor Management Relations Act hearings:

" 'Section 10(c) of the Labor Management Relations Act provides that "If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact * * *." 61 Stat. 147, 29 U.S.C.(Supp. III) § 160(c), 29 U.S. C.A. § 160(c). The responsibility for decision thus placed on the Board is wholly inconsistent with the notion that it has power to reverse an examiner's findings only when they are "clearly erroneous." Such a limitation would make so drastic a departure from prior administrative practice that explicitness would be required.'

That comment is here applicable. See also § 8 of the Administrative Procedure Act, 60 Stat. 242, 5 U.S. C.A. § 1007."

██ In the instant case the facts were substantially undisputed and we believe that the Board's conclusion, that the General Counsel had not sustained his burden of proof by a preponderance of the evidence that the company was discriminatorily motivated, was proper and justified by the evidence. When we so determine, our limited function is exhausted.

It follows that the order on review should be and is

Affirmed.

BAZELON, Circuit Judge (dissenting).

The issue in this case was sharply drawn at the hearing before the Trial Examiner. The general counsel of the Board asserted that the Company's refusal to re-employ the strikers involved here was discriminatory because it was based upon their active Union membership and "last ditch" participation in the strike. The Company's position was that it refused re-employment, not for such discriminatory reasons, but solely because no jobs were open when appli-

cations of these strikers were filed or were current.

I. But as to the availability of such jobs, the Trial Examiner found: [1]

1. From the end of the strike on March 29, 1951 through April 1953, the following numbers of employees were hired in the departments in which our petitioners had been employed:

| | |
|---|---|
| Selecting and Packing | 210 |
| Decorating | 162 |
| Automatic forming machines | 28 |
| Machine Shop & Mold Cleaning | 4 |

Our petitioners had been employed in these departments as follows: [2]

| | |
|---|---|
| Selecting and Packing | 16 |
| Decorating | 4 |
| Automatic forming machines | 4 |
| Machine Shop & Mold Cleaning | 1 |

2. The exhibits do not disclose exactly "when job openings occurred which should have been offered to the former employees. It is clear, however, that in most cases there were vacancies within a short time of the applications, because Respondent continued its hiring of new employees following the end of the strike and had employed a total of 158 by the end of the year."

II. As to the applications for such jobs, the Trial Examiner found:

1. Shortly before the strike began, "* * * Respondent issued a form letter to all employees, informing them that in event of a strike it proposed to operate the plant, that it intended to fill the jobs of employees who struck, and that after the strike it would take back any strikers who wished to return, if and when work was available for which they were qualified, provided they had not engaged in any improper or unlawful conduct in the meantime. Negotiations having proved unsuccessful, the Union called a strike on March 14, which was continued until March 29. There is no claim of any prior unfair labor practices, the General Counsel conceding that the strike was an economic one."

2. At a conference on March 29, between Union and Company representatives, looking to the termination of the strike, Mr. Gamble, one of the Union representatives, "referred to his knowledge that the Company had hired 'a lot of people' during the strike and inquired the Company's position as to taking back the other strikers 'as soon as you can find places for them.' Bartlett [the Company president] replied that most of the jobs had been filled, but that it was 'naturally' the Company's position to take the strikers back as soon as it could, 'because those are the people that know this job,' and that there would be no discrimination against them because of their participation in the strike. The conference ended with the announcement by Gamble that the strike was officially terminated and by [Company counsel] Mueller's congratulations to Gamble upon the peaceful conduct of the strike."

3. "The evidence does not show that express reference was made to the question whether individual applications were necessary. However, it was apparently understood that they were—presumably to indicate availability for employment —because Gamble, in announcing at the Union's strike headquarters the results of the conference, advised the strikers 'to immediately make

1. The findings of fact referred to and quoted hereafter are contained in the Trial Examiner's Intermediate Report and Recommended Order, Sept. 1953.

2. The Trial Examiner's finding on this point related to 30 individuals who filed the original complaint. The figures cited here apply that breakdown to the 25 who are appellants.

applications for employment through Mr. Coley [the Company's personnel director],' and because he subsequently continued to advise other strikers to make their applications. * * * Actually, many of the strikers had begun to make application upon the removal of the picket line at 11 a. m. They, and those who joined them later, formed a line, were admitted singly to Coley's office, and were there interviewed individually."

4. "The evidence is not in conflict as to the tenor of the interviews. Upon the striker's statement of his desire to return to work, Coley's response was to the effect that all jobs had been filled, that there were no openings, and that he would call the applicant when a vacancy arose. Coley told none of the applicants that it was either proper or necessary for them to renew their application periodically. To the contrary, he told some of the applicants, who specifically inquired, that new applications were unnecessary, that he had their names and their telephone numbers on the list and would call them when anything became available."

5. "On two occasions subsequent to the end of the strike, the Union called Respondent's attention to its failure to reinstate many of the strikers and sought to negotiate with Respondent on the matter. Thus, on April 24, Gamble called Bartlett to request a meeting to negotiate a contract, and complained also that a number of strikers had not been put back to work. Referring to production troubles in the plant, Gamble suggested that the sensible thing to do was to work out an agreement under which all the strikers would be taken back. Bartlett called back shortly and stated in effect that the Company was happy with things as they were and would let them remain.

"Rufus K. Ritchie, another International Representative of the Union, called Bartlett on August 6, and pointed out that a number of the strikers had not been reemployed, especially union officers and committeemen. Bartlett replied that he did not know that such was the case. Ritchie requested a meeting 'to see if something could be worked out.' Bartlett stated he would be away for a few days but would call Ritchie on his return. Around August 13 or 14, Bartlett called, stated that he had talked with Mueller, that the Company's position was that the Union no longer represented a majority of the employees, and he did not feel that anything could be gained by a meeting. Ritchie stated that the Company's position would force the Union to file a charge, and Bartlett replied that the Company would stand on its decision."

6. " * * * Written applications were taken from all new applicants, and when once an employee was hired, his application was kept on file permanently.

"If no jobs were open at the time applications were filed, Coley's practice was to inform the applicants that he would call them if vacancies arose, and he would then file the applications with other current ones in his desk to be referred to as employees were needed to fill vacancies. However, Coley considered applications to be current only for a period of from two weeks to a month, and he periodically cleared out his current file by removing from it applications which were more than a month old and by placing them in an inactive transfer file. In turn, Coley cleared out the inactive files every six months by destroying old applications in order to conserve space. Coley also testified that in cases where an applicant reapplied, his application was replaced in the current file for a new period of currency.

"Coley's explanation of his limitation on the currency of applica-

tions was that he had learned from experience that job seekers in Sapulpa were generally not available after a week or two, having either moved on or having accepted other employment, and that he had found it a waste of time to attempt to contact applicants even a week after their application. He admitted that although his practice was to *inform* applicants that he would call them if vacancies arose, what that amounted to, *though not disclosed to the applicants*, was that he would call them if vacancies arose within the next two weeks.

"Coley testified that he had adhered to the foregoing practice for some 8 or 10 years, and that he did not handle the strikers' applications any differently than he did those of new applicants. Since the strikers were former employees, Coley had their original written applications on file and he required no new applications of them. What he did was simply to list them as available for work, but as in the case of new applicants, he considered their applications to be current for only about two weeks. Thus, Coley testified that he did not refer to the list when vacancies arose more than 30 days after the applications listed thereon; that although he kept the list in his transfer files, he did not, for example, refer to it when vacancies arose as late as October 26, 1951 * * *." [Emphasis supplied.]

III. As to additional matters evidencing discrimination, the Trial Examiner found:

1. "Practically all of the strikers included in the complaint had walked the picket line either the morning of, or the day before, the end of the strike. Of a total of 10 union officers and committeemen, Respondent employed only one officer, Mary Easley (financial secretary), and one committeeman, Andrew Meyers. The circumstances surrounding both are significant.

"Meyers had applied for and was granted reinstatement prior to the end of the strike. His case is to be contrasted with Lola Wilson, who also applied to Coley prior to the removal of the picket line on March 29, and who was told to come back to work. Learning that the picket line was shortly to be removed, Wilson waited until it was taken off, then lined up with the other strikers and was interviewed by Coley, who listed her name with the others and stated that he would call her in [sic] anything became available.

"Easley had moved from Sapulpa following the strike, but in September 1951, Coley made a special trip to her home, some 20 miles from Sapulpa, and offered her employment. Easley was unable to accept at that time, but was later hired in February 1952, after notifying Coley that she was available for employment. Easley also testified, without denial from Coley, that shortly before the hearing, Coley had discussed with her the impending hearing in this case, stating among other things that a lot depended on the testimony to be given, that he was glad to have her back in the Company's employ, but that he would not 'walk across the street for some of them,' and that that was why he had come to look her up (for employment)."

2. The Company "ceased to reemploy strikers in any substantial number around April 19 [the strike ended March 29], which coincided roughly with [the Company's] refusal to negotiate with the Union as the representative of the employees."

The Board did not disturb the foregoing findings that (1) jobs were available; (2) the strikers in question had applied for such jobs; and (3) their "applications were understood to be continuing ones" and not *"for only a short and indefinite period."* Thus the sole reason which the Company offered for not employing these strikers is plainly

refuted by the record. Nevertheless the Board reversed the Trial Examiner's determination "that by failing to employ the [strikers here, the Company] discriminated against them for the purpose of discouraging membership in the Union and thereby engaged in unfair labor practices within the meaning of Section 8(a)(3) and (1) of the Act." The Board said, in effect, that a determination of discrimination was precluded by (1) the Company's non-discriminatory treatment of the vast majority of the strikers; and (2) the Company's background which was free of unfair labor practices.

In light of the record as a whole, including the Trial Examiner's findings, it seems to me that the matters relied upon by the Board may fairly be said to be frivolous. It is at least clear that, under any reasonable view of the Supreme Court's decisions in Federal Communications Commission v. Allentown Broadcasting Corp., 1955, 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147; and Universal Camera Corp. v. National Labor Relations Board, 1951, 340 US. 474, 71 S.Ct. 456, 95 L.Ed. 456, such matters are plainly insufficient to support the Board's action.