WAREHOUSEMEN AND MAIL ORDER EMPLOYEES, LOCAL NO. 743, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA; and Truck Drivers, Oil Drivers, Filling Station and Platform Workers Union, Local 705, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 16267.

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 28, 1961.

Decided Jan. 23, 1962.

Mr. Bernard Dunau, Washington, D. C., for petitioners.

Mr. Allison W. Brown, Jr., Atty., with whom Messrs. Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Joseph C. Thackery, Atty., National Labor Relations Board, were on the brief, for respondent.

Before PRETTYMAN, WASHINGTON and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

More fully identified as captioned above, the Warehousemen, Local 743, and the Truck Drivers, Local 705, ask us to set aside the Board's Decision and Order which dismissed a consolidated unfair

mental illness, and that he would be dangerous if released at the present time."

Cf. footnote 13 of the opinion of the court.

labor practice proceeding against Aetna Plywood and Veneer Company. Counsel for the petitioners and the Board at a prehearing conference held pursuant to our Rule 38(k), 28 U.S.C.A. stipulated the issues before us to be:

(1) Whether the Board properly found that the employer had not refused to bargain in good faith with petitioner Local 743 in violation of Section 8(a) (5) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (5).

(2) Whether the Board properly found that the employer's discharge of the warehousemen was not in violation of Section 8(a) (1) and (3) of the National Labor Relations Act, and that the employer's refusal to reinstate or reemploy the drivers was not in violation of Section 8(a) (1) and (3) of the National Labor Relations Act. The issue pertaining to the discharge of the warehousemen includes the question whether they had been permanently replaced before they were discharged.

Petitioners agree that from April, 1958 to November 5, 1958 the Company did not fail to bargain in good faith with the Warehousemen, Local 743, but contend that the Company so failed for the period commencing November 6, 1958. It is argued that such failure converted the strike into an unfair labor practice strike so that the Company's discharge of the warehousemen and its refusal to reinstate the warehousemen and drivers were unlawful. The Board found that throughout there had been an economic strike, and that the Company did not violate the Act when it later discharged some 14 warehouse employees who on July 22, 1958, went on strike in support of Local 743's economic demands and had been permanently replaced. So, too, the Board found no violation in the Company's denial of reinstatement to five truck driver members of Local 705 who were permanently replaced after they had refused to cross Local 743's picket line [1] in July, 1958 and thereafter.

The Trial Examiner found against the Company, but the full Board unanimously concluded otherwise, largely placing its own interpretation upon and drawing different conclusions from the facts.[2] Under section 10(f) of the Act, 29 U.S.C.A. § 160(f), the findings of the Board are conclusive if supported by substantial evidence on the record considered as a whole. The responsibility for decision rests primarily upon the Board,[3] to be sure. But after according to its findings that respect which the Board's expertness requires, we are free to reverse if we "cannot conscientiously" [4] find its decision to be supported by substantial evidence of record viewed in its entirety. An appraisal of the record, so to be considered, devolves upon this court.[5]

Here the facts are largely undisputed whether as found by the Trial Examiner or by the Board. Such differences as may be perceived stem not from issues as to credibility but from inferences which the Board was free to draw.[6] We have carefully reviewed the Intermediate Report, the Decision of the Board, the exhibits and the record as a whole. Salient is the long-standing relationship between the parties with no suggestion of a refusal to bargain. Indeed, the representatives of Local 743 and the Company met for bargaining discussions both before the existing contract expired, and repeatedly thereafter. Next in importance perhaps, as we reconstruct the situation, was that

1. The finding that the drivers had been permanently replaced is not contested.

2. See 130 N.L.R.B. No. 18.

3. American Flint Glass Wkrs. Union v. National Lab. Rel. Bd., 97 U.S.App.D.C. 244, 248, 230 F.2d 212, 216, cert. denied, 351 U.S. 988, 76 S.Ct. 1047, 100 L.Ed. 1501 (1956).

4. Universal Camera Corp. v. Labor Bd., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L. Ed. 456 (1951).

5. Id. at 491, 71 S.Ct. 456.

6. International Woodworkers of America v. N.L.R.B., 104 U.S.App.D.C. 344, 345, 262 F.2d 233, 234 (1958).

the Local went on strike in July, 1958, ill-advisedly it may have appeared to the Board, when very substantial progress had already been achieved. Again, these 14 warehouse employees handled plywood in sheets, a task which for many months after the strike began was executed by a warehouse superintendent, two foremen and six clerks. Bargaining sessions still went forward. Such was the background against which we need provide few details in view of the more complete recital appearing in the Board's Decision and Order.[7]

In 1955 the Company and Local 743 had executed a contract to expire April 30, 1958, covering a 14-man warehouse unit at the Company's Chicago plant. The business representative of Local 743 already aware, of course, of the provisions of the expiring contract, in March, 1958, submitted a list of eleven changes and modifications the Local intended to seek in a new contract. There was no refusal of continued recognition of the union. There was no rejection out of hand of the proposals—no suggestion that an accord might not be reached. On the contrary, the first meeting of a long series of negotiating sessions was held in April, 1958. At that conference, the Company's comptroller made reference to the Company's desire for the deletion of some paragraphs and the addition of others. Again, at the conciliation commissioner's office, he pointed out that discussion as to the Local's proposals was subject to consideration of the Company's points. The parties proceeded first to resolution of the Local's proposals, and negotiations so continued through some 10 or 12 sessions down into November, 1958.

By July 8, 1958, the parties, after some six bargaining sessions, had agreed upon seven of the Local's eleven proposals with an impasse particularly as to a wage increase. The Company claimed it had lost many thousands of dollars in recent years. The Company offered 8 cents the first year, and five, the second and third years. The Local voted to strike unless it received ten cents, seven and seven. The 14 warehouse employees walked out, July 22, 1958. From July 8, 1958, to February 6, 1959, eleven additional negotiating sessions were held, with the strike still in progress.[8]

The Company in February, 1959, commenced hiring replacements for the strikers, and as of March 23, 1959, notified the latter that they had been permanently replaced. The Local concedes that in an economic strike

"the employer can replace the striking employees with others in an effort to carry on the business and is not required to discharge those hired to fill the places of the strikers upon the election of the latter to resume their employment. * * *

"However, if the strike is caused by an unfair labor practice, the striking employees are entitled to reinstatement upon the termination of the strike."[9]

The Local argued to the Board "that even if no refusal to bargain is found, the strikers are entitled to reinstatement since they were never permanently replaced." The Board concluded that "There is no merit to this contention," adding, after noting highlights from the evidence, that since the warehouse employees on strike "were economic strikers at all times," the Company was entitled to replace them. We agree.

We turn back accordingly to consideration of the circumstances as they developed early in November, 1958 and thereafter. There is no suggestion that the Company had, at least until then, been motivated by bad faith in its ten or more previous bargaining sessions with the

7. Supra note 2.

8. Not until March 15, 1960 did the Local notify the Company that the strike was being terminated and that the strikers wished to return to work.

9. National Labor Rel. Bd. v. Wooster Div. of Borg-W. Corp., 236 F.2d 898, 906 (6 Cir. 1956), affirmed in part and reversed on other grounds, Labor Board v. Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

Local. On November 6, 1958 the negotiators again met. The Local's representative pointed out that the increase in wages and cost-of-living issues were "still prime factors." The Company said there were some changes in the contract which it desired. The Company was asked by the Local's attorney to reduce to writing its proposed modifications, and it did so, presenting four points [10] when the parties met again the following day.

The Local argues now that by November 7th it "had surrendered its position on all disputed issues which had caused the strike and nothing stood in the way of agreement based on the pre-strike status of bargaining." But at no time, not even once, as far as our careful study of the record discloses, had negotiatory consideration been given to the Company's position. It had stated at the first meeting that it desired certain changes, but the bargaining throughout had proceeded solely with reference to the Local's 11 demands.

We find no evidence that the Local on November 7th had communicated to the Company that the union had "surrendered its position on all disputed issues." On the contrary, it insisted that wage increases and cost of living clauses were still "prime factors." It is totally unrealistic to argue, the Board might well have concluded, that the Company "converted" the economic strike into an unfair labor practice strike by advancing its own proposals. That they were not inherently unreasonable we may agree, for the record shows that the Local promptly acquiesced in two of them. Bargaining went forward as to the others.

The Company insisted that a salesman should be able to pull down a sheet of plywood and show it to a customer without having to get a warehouse helper to handle the plywood. It should be able to call for overtime service when it received word that a shipment of plywood was on the way in. The 3 months' strike had led the Company to believe it had too many warehouse workers, and to announce that after the strike not all men would be rehired. The Company had lost some $200 thousand to $300 thousand the previous year, the Local's witness testified he had been told. It is clear that the strike had had severe impact upon the respective parties, not only from the economic viewpoint, but from the hardening of their attitudes toward remaining issues. Modifications of proposals and concessions in varying degrees, with resistance on each side as to yet other points, marked bargaining sessions which were held November 13 and November 26, 1958, and later on January 16, and February 4 and 6, 1959, when an impasse finally developed.

We find ourselves unable to say that the Company here had violated federal law. Put otherwise, the Board was free to infer that the Company did not bargain in bad faith.[11] The proposals and the counterproposals dealt solely with subjects of mandatory bargaining.[12] There is no *per se* test of good faith as negotiations went forward. As is true in so many situations where hard bargaining is at the root of a management-labor impasse, the problem becomes one of balancing conflicting legitimate interests. "The function of striking that balance to effectuate national labor policy is often a diffi-

10. The Company sought: a no-strike clause, a management prerogative clause, agreement as to the hiring of casual workers, and permission for foremen and salesmen to perform certain warehouse work without restriction. The Local agreed to the no-strike clause and the management prerogative clause. Bargaining sessions went forward thereafter on other aspects, as first one side and then the other established a common area of agreement.

11. N. L. R. B. v. Reed & Prince Mfg. Co., 205 F.2d 131 (1 Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953); cf. National Labor Relations Board v. Fant Mill. Co., 360 U.S. 301, 304, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959).

12. National Labor Relations Board v. Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718 (1958).

cult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." [13] It is certainly so that it is beyond the province of the Board to "regulate the choice of economic weapons that may be used as part of collective bargaining * * *." [14] In short, the Board could have concluded that there was developed on this record, viewed in its totality, no inconsistency between the application of economic pressure and good faith collective bargaining. The two factors "exist side by side." [15]

The law has not committed the decisional process to the Trial Examiner. Administration of the Act has been reposed in the Board. Here was no issue of credibility, for the facts are largely undisputed. The Trial Examiner indeed had made no finding whatever with respect to the Company's *reservation* [16] of its undoubted right in due course to seek consideration of its own proposals, whatever they might be. On brief here the Local asserts it had "virtually capitulated," to borrow a term, but the record makes no suggestion that the Company had so been informed at the November 6th and 7th conferences. If the Local had agreed to all four of the Company's proposals then

first submitted instead of only two of them, there would perhaps have been no further need for additional bargaining. Yet negotiations continued and the Company, in turn, yielded in part as did the Local with respect to the Company's proposals. Meanwhile the strike not only persisted, but was prolonged for an additional fifteen months. Such was the situation upon which the Board's unanimous judgment was exercised, with a conclusion greatly at variance from the "virtually capitulated" status for which argument is belatedly advanced. Five experts devoting their whole skill in labor-management problems unanimously and realistically considered the entire record—not a partial scope which had omitted critical factors and their proper place in giving perspective to the early November negotiations. The Board in its dutiful administration of the Act simply placed a different interpretation upon the facts than did the Examiner.

We conclude that it was open to the Board on the entire record here to decide that the Company had not bargained in bad faith. It follows that the Decision and Order of the Board must be

Affirmed.

13. National Labor Relations Board v. Truck Drivers Union, 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676 (1957), and see note 28; cf. discussions in both majority and dissenting opinions in N. L. R. B. v. Katz, 289 F.2d 700 (2 Cir.), cert. granted, 368 U.S. 811, 82 S.Ct. 53, 7 L.Ed.2d 20 (1961); and see N. L. R. B. v. Herman Sausage Co., 275 F.2d 229 (5 Cir. 1960).

14. National Labor Relations Board v. Insurance Agents, 361 U.S. 477, 490, 80 S. Ct. 419, 427, 4 L.Ed.2d 454 (1960).

15. Id. at 489, 80 S.Ct. 419.

16. The following should be considered with and be added to the matter quoted in footnote 3 of the dissenting opinion.

The Company's comptroller had attended every bargaining meeting, the testimony showed, and the fact that the Company intended to submit proposals was made known "at the very first meeting, in April of 1958." Again the subject was brought up at the first meeting in the Conciliation Commissioner's office, as to which the following appears:

"Q. Did you discuss any requested changes that you made at any time? A. No [The Local's representative] agreed with the Commissioner. The Commissioner asked them if they wanted to discuss those now, and they said, 'no, let us discuss the eleven points.' "

There had been several meetings between negotiators for the Local and for the Company prior to July 8, 1958 which had not been attended by Peters, President of the Local, and chief witness for the General Counsel.

Just why testimony offered by one party is "self-serving," as distinguished from that offered by an opposing party, our colleague does not make clear. The fact remains that the quoted testimony, like the Board's finding, is unrefuted and unchallenged on this record, and the Board had a right to accept it and rely upon it.

WASHINGTON, Circuit Judge (dissenting).

The central question in this case is whether the Board erred in finding, as it did, that the Aetna Plywood and Veneer Company had not refused to bargain in good faith with Local 743.[1] The crucial period, according to petitioner, commenced on November 6, 1958. At this point, only four of the eleven principal issues disputed by the parties remained unsettled. These issues involved a wage increase, a cost-of-living clause, insurance coverage of dependents, and a more generous vacation policy. But at the negotiating session held on November 6, the company, without notice and for the first time, suddenly announced four major, substantial changes it wanted made in the contract: (1) a no-strike clause, (2) a management prerogative clause, (3) the right to hire casual workmen "at any time to handle unusual work loads or peak loads" in the warehouse unit, and (4) the right to have foremen and salesmen do warehouse work. At the same time, the company's representative orally announced that, after the strike, the company would substantially reduce the number of warehousemen.[2] At the request of the Local's attorney, the company reduced its four demands to writing on the following day. At the November 7 meeting, the union receded from its wage position, and agreed to the wage increase which the employer had proposed, without provision for a cost-of-living increase.

As the Board itself says in its brief to this court, Local 743's president "suggested the Local might wait a year to make the vacation policy effective" and on November 6, 1958, said that "Local 743 would 'forget about' dependent insurance and vacation policy if the Company would make a satisfactory offer." Thus, by November 7, the union had virtually capitulated on all four of the issues which had been the only serious bar to settlement until the company made its additional demands on November 7. The sole justification the company and the Board advance for the belated injection of new issues into the negotiations was that "the Company indicated at the first negotiation session in April 1958 that it desired certain changes in the contract," and that the company postponed identification of its demands in deference to the union's wish that the union's "11 proposed changes and modifications be considered first * * *." But the record unequivocally indicates that these modifications desired by the company, and resurrected on November 7, had not been mentioned or referred to by either party to the negotiations except at the very first bargaining session and at the first meeting in the Commissioner's office. More important, the record also unequivocally indicates that the modifications sought were merely "wording changes."[3]

In view of the number and importance of the demands made by the company, these demands cannot reasonably be clas-

---

1. If the company failed to bargain in good faith the strike against the company would be converted into an unfair labor practice strike, and the company's dismissal of the warehousemen would itself be an unfair labor practice.

2. This is based on testimony offered by the company. The union alleged that the company's representative said: "We are not going to use any warehousemen anymore. We will be able to do without them because we are going to have to use the foremen and these salesmen * * *."

3. The comptroller of the company, a participant in the collective bargaining, testified:

"THE WITNESS: The union proposition was on eleven points. So, when we started to discuss any of those points, I said, now, anything we arrive at here had no bearing on an agreement that doesn't take into consideration the wording changes in the contract.
"BY MR. SCHOONHOVEN:
"Q. What wording changes? A. Well, many paragraphs were ambiguous. We wanted to delete some. We wanted to add some."
Even this explanation is, of course, a self-serving declaration. There is no indication that the union knew, and no reason appears why it should have known, that "wording changes" meant new, substantive and substantial proposals.

sified as "wording changes," and certainly cannot be justified as such. "Wording changes" imply, as the company stated, clarification of "ambiguous" provisions. They do not connote proposals which may significantly alter existing benefits and protections enjoyed by the employees under their previously existing (though now expired) contract.

Nevertheless, the union agreed to the no-strike clause and the management clause. On the foremen and salesmen issue, the union advanced two counter-proposals which would have permitted salesmen to perform warehouse work when in connection with a selling activity, and would have allowed foremen to perform warehouse work when warehouse-men were unavailable or when "business operations so require." The company agreed to respond to these counter-proposals at a later meeting.

At the next meeting, the company responded by making five new demands. These were (1) deletion of the guaranteed work week which had been provided for in the previous agreement, (2) deletion of provisions in the expired agreement which had, among other things, forbidden any party from entering agreements which interfered with the intent of the collective bargaining agreement, (3) access by union representatives to company premises conditioned on prior consent of the Branch Manager, rather than simply prior notification, as provided for in the expired agreement, (4) to qualify for sick pay, the employee may be required to show proof of illness, and (5) deletion of a clause in the prior agreement which had granted time-and-a-half wages to day shift employees reporting before normal starting time or after 4:30 P.M. In addition to these five issues, the company proposed to change the agreed content of the management prerogative clause, notwithstanding the union's previous assent to the form in which the company had originally presented it.

In reply to the union's counter-proposals, the company asked that salesmen be permitted to perform warehouse work for the purpose of "servicing a customer," rather than just to show merchandise to a customer. The company also proposed that the "foremen may perform any work necessary to efficiently utilize their time." The union objected that this removed any effective qualification on the performance of warehouse work by non-warehouse-men.[4] Hence the union argued, it would be impossible to get the warehousemen to vote to accept the contract, when at least some of them would be losing work and their jobs by doing so. At the same time, the company sought, for the first time, to make performance of overtime a condition of employment.[5] Moreover, by providing that seniority should govern overtime whenever practical, it proposed to modify the prior right of the employees to secure in seniority order the overtime work which was available. Four further meetings were held by the parties between November 13, 1958, and February 6, 1959. Suffice it to say that there was some compromise on both sides, but the parties were unable to resolve their differences. In February 1959 the company began to hire employees to replace the warehousemen on strike. On March 23, 1959, after a total of 18 had been hired, the company notified the union

<hr>

4. "Job security is an inherent element of the labor contract, a part of its very being. If wages is the heart of the labor agreement, job security may be considered its soul. * * * The transfer of work customarily performed by employees in the bargaining unit to others outside it must therefore be regarded as an attack on the job security of the employees whom the agreement covers and therefore on one of the contract's basic purposes." New Britain Machine Co., 8 Lab.Arb.Rep. 720, 722 (1947).

5. Under settled industrial practice, an employee is not expected to work overtime unless "he is given advance notice sufficient to enable him to alter his plans * * *." Ford Motor Co., 11 Lab.Arb. Rep. 1158, 1160 (1948). The company's proposal contained no such limitation.

that it had hired permanent replacements and was withdrawing all offers it had made.

Where, as here, "the employer engaged in a lengthy series of bargaining conferences, which got nowhere * * * the question is whether it is to be inferred from the totality of the employer's conduct that he went through the motions of negotiation as an elaborate pretense with no sincere desire to reach an agreement if possible, or that it bargained in good faith but was unable to arrive at an acceptable agreement with the union." N. L. R. B. v. Reed & Prince Mfg. Co., 205 F.2d 131, 134 (1st Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). The Board here found that the company had bargained in good faith. Whether substantial evidence supports this conclusion "is a question which Congress had placed in the keeping of the Courts of Appeals." Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 491, 71 S.Ct. 456, 466 (1951). And, as the Supreme Court has observed, "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." Id. at 496, 71 S.Ct. at 469. We must especially give weight to the examiner's conclusion upon such an issue as good faith in bargaining. For " 'Good faith' is one form of credibility; it means that the motive that actuated the conduct in question was in fact what the actor ascribes to it * * *." N. L. R. B. v. James Thompson & Co., 208 F.2d 743, 745 (2d Cir. 1953).

Here, the trial examiner observed in part that—

"The whole coterie of facts in the instant matter from the sudden and unexpected demands made by Respondent on November 6, 1958, the very nature of those demands coupled with the threat of substantial reduction of employees in the warehouse unit, the adamant adherence to, and strengthening of, those demands by Respondent together with the several temporary diversions created by Respondent from time to time plus the March 23, 1959 'terminations' of strikers and the filing of the RM petition for a unit of 14 employees leads but to the conclusion that on and after November 6, 1958 Respondent was sitting at the negotiations with a firm resolve either to reach no agreement with the Union or to provide for the elimination of the Union as the bargaining agent by abolishing the bargaining unit. This constitutes a refusal to bargain in violation of Section 8(a) (5) and (1) which necessarily prolonged the economic strike and converted it on November 6, 1958 into an unfair labor practice strike as of that date. The undersigned so finds.

"As a necessary corollary thereto the undersigned must also find that on and after November 6, 1958 the strikers became unfair labor practice strikers so that the terminations of March 23, 1959 were discriminatory and in violation of Section 8(a) (3) and (1) of the Act. The undersigned so finds."

In light of the evidence and the findings of the trial examiner, the Board's conclusion that the company had not failed to bargain in good faith is in my view a determination unsupportable upon a fair assessment of the entire record. Here, the company repeatedly used the flimsy excuse of "wording changes" to introduce new, numerous, and substantial demands late in the negotiation. The invocation of magical labels like "hard bargaining" or "economic pressure" cannot obscure the fact that reasonable men bargaining in good faith do not act as the company acted in this case. I would reverse the Board.