The **LAIDLAW CORPORATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 17033.

United States Court of Appeals
Seventh Circuit.

July 28, 1969.

Rehearing Denied Sept. 2, 1969.

D. C. Duck, Charles W. Culp, Indianapolis, Ind., for petitioner; Cadick, Burns, Duck & Neighbours, Indianapolis, Ind., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Norton J. Come, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate General Counsel, John D. Burgoyne, Michael N. Sohn, Sanford H. Fisher, Attys., N.L.R.B., for respondent.

Before MAJOR, Senior Circuit Judge, KILEY and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

The principal question presented in this review is whether the rule enunciated in NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), should be applied to the facts in this case.

The Laidlaw Corporation is engaged in the manufacture of wire and related products. It petitioned this court to review an order of the Labor Board issued June 13, 1968. The Board cross-petitioned for the enforcement of its order.

The violations of the National Labor Relations Act which the Board found were: section 8(a) (1) by threatening to deny employment forever to its employees if they struck and were replaced and by maintaining an invalid no-distribution rule; and section 8(a) (3) and (1) by failing and refusing to offer a replaced striker full reinstatement to his former job, by terminating the employment status of a large number of other replaced strikers following their unconditional offer to return to work, and by later failing and refusing to offer them reinstatement.

The factual background giving rise to these violations is as follows. In June 1962, as a result of a representation election, the International Brotherhood of Pulp, Sulphite and Paper Mill Workers, AFL–CIO, was certified as the collective bargaining representative of Laidlaw's production and maintenance employees at its Peru, Indiana plant. Since then Laidlaw and the union have operated under successive collective bargaining agreements, the most recent covering the period December 14, 1964 to December 13, 1966. The contract contained a provision for mid-term negotiations with respect to wages. Such negotiations, if requested by either party, were to take place during the period from December 14, 1965 to January 13, 1966.

In October and November 1965 the union notified Laidlaw of its desire to reopen the contract pursuant to the wage-reopener clause in order to renegotiate wages. Thereafter the parties met at various times in December 1965 and January 1966. At a meeting on January 7, 1966 the company refused to offer any wage increase, asserting that it had lost money in previous years and wanted to see whether its operations, which had been profitable for the first two months of its current fiscal year, would continue to show a profit for the next three months. The company said that it would agree to new wage negotiations in three months if the union would abandon its demands.

On January 8, 1966 the employees rejected the company's proposal and voted to strike in support of their demand for a wage increase.

On January 11 the union sent the company a telegram stating that the strike

would begin at noon on January 12. That afternoon, plant manager Johnston read a prepared speech to about seventy-five of the company's employees. He said in part:

The Company has decided to continue to operate through the strike, and in doing so will provide work for all employees who decide to work and will hire new employees to replace those on strike.

Mr. Wentz has told those of you at the Union meeting last Saturday that our attorney Mr. Duck lied to you on last Friday when he told you that under Federal Law if you do go on strike and the Company hires a replacement for you you *Lose Forever* your right to employment by this company. I want to assure you that such *IS* the law. Mr. Duck told you the absolute truth. Let me suggest that before you take action that can seriously and permanently affect your future here, you check with any lawyer of your own choice or with the Indianapolis Office of the National Labor Relations Board. You will find Mr. Wentz has misled you and Mr. Duck has told you the absolute truth. (Emphasis in original text.)

The following day, seventy of the company's ninety-nine employees went on strike. Picket lines were immediately set up with signs reading, "Local 681 on strike for fair wages."

William Massey, an employee of the company since June 1961, was one of the strikers. On February 14 he telephoned his supervisor and asked to return to work and was told to report the next morning. When Massey arrived, he was informed by the employment manager that his job was "filled" at that time as were the jobs of all male employees. He was also told that if the company were to reemploy him, it would be as a "new employee" at the minimum contract starting wage. Three days later the employment manager telephoned Massey and asked him to return to work. Massey was assured that he would receive the same pay he was earning when he went on strike, but that he "would have to be reinstated as a new employee." Later that afternoon, Massey spoke with the plant manager about the loss of his accrued seniority and vacation rights. He was told that he would be denied his seniority and vacation pay. Massey refused to return to work under these circumstances and continued to strike.

During the strike, plant manager Johnston told foreman Bridges that they should replace the strikers "as fast as we can" and to get rid of the employees with the most seniority because they were the "troublemakers." On February 10 approximately fifty of the striking employees met and voted to abandon the strike and return to work. The following morning about forty strikers appeared at the plant and conveyed their desire for reinstatement. The union representative informed Johnston of the vote taken the preceding day and handed him a sheet of paper which "outlined briefly" the employees' decision to return to work. Additionally, each of the employees present gave to Johnston a printed form letter stating:

On January 12, 1966 I, along, with some 70 other Laidlaw employees, went on strike in protest of certain unfair labor practices.

As of this date I am unconditionally offering to return to work immediately.

Please advise me immediately.

Following a telephone conversation with the company's attorney, Johnston read the following statement to the gathered employees:

Many of you have been permanently replaced and are not entitled to reinstatement. As soon as we can determine if there are job openings today, those of you for whom there are such openings, if any, will be notified on or before Monday to report to work.

The union representative emphasized to Johnston that although many of the strikers were not present that morning, "our unconditional offer to return did

apply to all of the members of the local union."

Following this meeting with the employees, the company determined that, as of February 11, all but five of the strikers had been replaced and, hence, only five employees were needed to bring the work force up to its prestrike level. On February 11 five of the striking employees were notified by telegram of the vacancies and offered reinstatment.

On February 15 the company received five additional requests for reinstatement from striking employees. Again, the company checked its vacancies and determined this time that it had nine openings. Accordingly, it sent employment offers to all five. Four of the five returned to work the next day. The fifth requesting employee made no response. The other four openings were "filled with new hires," whose applications the company had "on file." The new employees also reported for work the next day. In deciding how to fill the remaining four openings, the company gave no consideration to any of the striking employees who had applied for work on February 11 because, according to Johnston, "We were handling this on the basis of the dates they applied for reinstatement," and "if they didn't apply on the right day [the company was not] going to call them the next day, so to speak."

On February 16 the company received four more requests for reinstatement from strikers. At this time, however, the company had no openings, and it, therefore, made no offers. On the same day, the company began mailing to the Indiana Employment Security Division printed "termination" notices, setting forth the "date of separation" of each striking employee to whom it had not offered reinstatement, which in each case was the date on which the company received the striker's request for reinstatement. Each notice stated, "This person permanently replaced while on economic strike and no job available on [date of application for reinstatement]." Copies of these notices were also sent to each affected employee.

On February 18 the company received applications for reinstatement from three more strikers. Johnston again reviewed the company's needs for that day and determined that four jobs were available. The three employees whose applications were received that day were offered reinstatement. Again, none of the strikers whose application for reinstatement had been received on previous days was considered for the additional vacancy; the opening was considered for the additional vacancy; the opening was filled with a new employee.

During the week of February 14 to 18, the employees who were not reinstated continued to picket outside the company's premises, but when the reinstated employees approached the plant to go to work, the picketing employees took the picket line down in order to allow them to enter without having to cross a picket line.

On February 20 a group of approximately eleven employees who had been reinstated or offered reinstatement met with the union representative. These employees protested the company's act of terminating many of the strikers and its failure to reinstate numerous strikers despite job openings. The representative told the employees that they had the right to file unfair labor practice charges based on the termination of union members' employment and that if they did not wish to return to work, they did not have to do so. The employees then decided that they would "go on strike under the sign of an unfair labor practice strike."

The next day, the picket signs were changed to read, "Local 681 International Brotherhood of Pulp and Sulphite on strike protesting unfair labor practices." After February 21 the company continued to advertise for new employees, as it had done from the beginning of the strike on January 12. From February 12 to March 21, the company hired a total of some fifty new employees. The com-

pany made no further offers of employment to any of the strikers.

The Board found that the company violated section 8(a) (3) and (1) of the Act by refusing to reinstate striker Massey when his former job became available unless he agreed to return as a new employee without accrued seniority and vacation rights. The Board also found that the company violated section 8(a) (3) and (1) of the Act by terminating the employment status of strikers whose jobs were held by permanent replacements on the date they applied to return to work. The Board held that, absent substantial business justification, the company was required to offer reinstatement to these strikers as vacancies arose because of the departure of permanent replacements. Alternatively, the Board held that the company did not seek out these strikers as vacancies arose because it sought to penalize them for participating in the strike and that such a motive for filling vacancies with new employees was impermissible under section 8(a) (3) and (1) of the Act.

Laidlaw had posted, distributed to its employees, and otherwise maintained a set of plant rules. "Minor" Plant Rule Number 7 prohibited "Circulating petitions or printed matter of any kind on company premises." A "violation" of this rule subjected the offender to disciplinary warnings and possible dismissal. The Board found that the company violated section 8(a) (1) of the Act by maintaining the unduly broad no-solicitation rule and by threatening employees that if they went on strike, they would be replaced and would lose their employment rights forever.

The Board's order requires the company to cease and desist from the unfair labor practices found and from in any other manner interfering with, restraining or coercing its employees in the exercise of their section 7 rights. Affirmatively, the company is directed to rescind the invalid no-distribution rule; to offer Massey and the fifty other strikers whose employment was terminated immediate and full reinstatement with back pay from the dates on which the company should have hired them as their jobs became available, with the order of hiring to be determined by departmental seniority; to offer the reinstated employees who resumed striking on or before February 21 immediate and full reinstatement upon their unconditional offer to return to work; and to post the customary notices.

In its decision, the Board held that economic strikers "who unconditionally apply for reinstatement at a time when their positions are filled by permanent replacements" not only remain employees, but are entitled to full reinstatement upon the departure of replacements unless they have in the meantime acquired regular and substantially equivalent employment or unless the employer has sustained his burden of proof that the failure to offer full reinstatement was for legitimate and substantial business reasons. In so holding, the Board said that it was following the underlying principle enunciated in both NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), and NLRB v. Great Dane Trailers, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). It noted that the Supreme Court in *Fleetwood* had held that the hiring of new employees at a time when there are outstanding applications for reinstatement from striking employees is presumptively a violation of the Act, regardless of intent, unless the employer demonstrates a "legitimate and substantial business reason" for his failure to hire the strikers. The Board concluded that the situations in *Fleetwood* and the present case are parallel and that the *Fleetwood* rule should be applied against Laidlaw. The Board said: "when job vacancies arose as the result of the departure of permanent replacements, Respondent [Laidlaw] could not lawfully ignore outstanding applications for reinstatement from strikers and hire new applicants. * * *" We agree with the Board's views and its holding.

After the strike ended on February 10 Laidlaw adopted a fixed policy with reference to strikers who sought reinstatement. It considered only those striker-applicants who applied for reinstatement on the very day vacancies occurred. If there were no vacancies at the time the strikers applied, the company considered the employee status of those striker-applicants as terminated. The company admitted that this was its policy.[1]

In *Fleetwood*, a similar position was asserted by the employer with respect to openings occurring during the time the employer gradually returned to his pre-strike level of production. The Supreme Court unequivocally rejected the contention that the strikers lost their right to reinstatement because no openings were available at the time they asked to return to work. On this point the Court said:

> It was clearly error to hold that the right of the strikers to reinstatement expired on August 20, when they first applied. This basic right to jobs cannot depend upon job availability as of the moment when the applications are filed. The right to reinstatement does not depend upon technicalities relating to application. On the contrary, the status of the striker as an employee continues until he has obtained "other regular and substantially equivalent employment." (29 U.S.C. § 152(3).) Frequently a strike affects the level of production and the number of jobs. It is entirely normal for striking employees to apply for reinstatement immediately after the end of the strike and before full production is resumed. If and when a job for which the striker is qualified becomes available, he is entitled to an offer of reinstatement. The right can be defeated only if the employer can show "legitimate and substantial business justifications."

NLRB v. Great Dane Trailers. NLRB v. Fleetwood Trailer Co., 389 U.S. at 380–381, 88 S.Ct. at 547.

In defense of its position, Laidlaw contends that permanent replacement of economic strikers constitutes a legitimate and substantial justification for not offering the strikers reinstatement. Once jobs are filled by "permanent" employees during an economic strike, the company maintains that the strikers have no right to reinstatement even though the replacements depart from their jobs. For support of this proposition, the company relies on the *Fleetwood* decision and NLRB v. Mackay Radio & Tel. Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). Its reliance is misplaced.

In *Mackay*, the Supreme Court was faced with a situation where all but five of the employees who had struck for higher wages were rehired after the strike ended. The Board had found the employer guilty of an unfair labor practice because it had failed to reinstate these five strikers, holding that this failure was motivated by antiunion animus. The Supreme Court, in reversing the Ninth Circuit, affirmed the Board. The Court made it clear, however, that the basis of its holding was the employer's antiunion motivation and that the Act did not require an employer to discharge permanent striker replacements. The Court said that it is not "an unfair labor practice to replace the striking employees with others in an effort to carry on the business"; that the employer retains "the right to protect and continue his business by supplying places left vacant by strikers"; and that the employer "is not bound to discharge those hired to fill the place of strikers, upon the election of the latter to resume their employment, in order to create places for them." 304 U.S. at 345–346, 58 S.Ct. at 910–911.

---

1. Plant Manager Johnston testified before the trial examiner as follows:
   Q. You felt no obligation whatsoever on the 15th [of February] to fill these other five slots with people who applied just two or three days before that, when they were former employees?

A. We were handling this on the basis of the dates they applied for reinstatement.
Q. If they didn't apply on the right day you weren't going to call them the next day, so to speak? * * *
A. Yes, sir.

In conclusion, the Court said that so long as the employer was not antiunion motivated, he might "resort to any one of a number of methods of determining which of its striking employees would have to *wait* because [other] men had taken permanent positions during the strike." 304 U.S. at 347, 58 S.Ct. at 911. (Emphasis added.)

In *Fleetwood,* the Supreme Court said that "unless the employer who refuses to reinstate strikers can show that his action was due to 'legitimate and substantial business justifications,' he is guilty of an unfair labor practice." 389 U.S. at 378, 88 S.Ct. at 546. The Court went on to observe:

> In some situations, "legitimate and substantial business justifications" for refusing to reinstate employees who engaged in an economic strike have been recognized. One is when the jobs claimed by the strikers are occupied by workers hired as permanent replacements during the strike in order to continue operations. *Id.* at 379, 88 S. Ct. at 546.

The justification for not discharging replacements in order to reinstate strikers, found in *Mackay* and mentioned in *Fleetwood,* is the need of the employer to assure permanent employment to the replacements so that the necessary labor force can be obtained to maintain operations during a strike. But such a justification is not present in the instant case. There is no question about the retention of the replacements who were hired during the strike on a permanent basis. The only question is whether the strikers are to be considered employees after the strike, having rights to reinstatement if the replacements depart from their jobs. The legitimate business reason for not discharging replacements in order to reinstate strikers, mentioned in *Mackay* and *Fleetwood,* did not authorize denying the Laidlaw strikers reinstatement after

the replacements had for one reason or another departed from their jobs subsequent to the strike's termination. Although there is a "legitimate and substantial business justification" for requiring replaced economic strikers to wait for reinstatement until a vacancy occurs in the labor force, no justification was advanced by Laidlaw for its decision to consider the employment status of striker-applicants terminated if, on the day they applied for reinstatement, their former positions were still occupied by permanent replacements.

Laidlaw argues that the Board's decision "creates in perpetuity a vested interest of an employee in the job, or any substantially equivalent job, he held when he first went on strike." It asks: "When does a striker's right to reinstatement expire, if ever?" The answer to this argument is that here the employer refused to consider reinstatement only days after the strikers applied and vacancies occurred. In these circumstances, the Board was not required to determine what the impact of the passage of time or inability to notify applicants of vacancies might have on the employer's duty to honor applications for reinstatement.[2]

Laidlaw advances an additional argument why the Board's decision is erroneous. It says that "the Board's decision and order requires it to seek out strikers after February 11, 1966, and offer them reinstatement as jobs become available." This duty, according to Laidlaw, was based on the Board's finding that the strikers' requests to return were continuing in nature. The company argues that this finding is not supported by the record. In our opinion, an examination of the record does support the finding made by the Board.

The strikers not only applied for reinstatement through their union representative; they applied individually through

2. We do not view the employer's duty to seek out replaced economic strikers to be a severe burden in practice. "Employers, who presumably retain the addresses and phone numbers of the strik-

ers, should not find it overly burdensome to give them notice that a position has fallen vacant." 82 Harv.L.Rev. 1777, 1779 (1969).

form letters.[3] Moreover, they continued to picket at the company's plant. Finally, a week after the wage-demand strike had ended, the reinstated strikers joined the picket line with signs expressly protesting the company's failure to offer reinstatement to their fellow strikers. The company could not possibly have entertained any reasonable doubts that the strikers wanted their jobs back.

But Laidlaw argues that since the strikers' requests for reinstatement on February 11 stated, "I am unconditionally offering to return to work immediately," the use of the word "immediately" meant now, at this moment, and not some time in the future. Therefore, it says the Board was wrong in inferring that the demand for reinstatement was a continuing one. We are not impressed by this argument. The use of the word "immediately" was reasonably intended to mean that the striker-applicant was ready to go to work at the time he applied for reinstatement and thereafter.[4]

The Board based its finding that section 8(a) (3) and (1) was violated on alternative grounds. Not only did the Board hold that, regardless of Laidlaw's motivation, the company unlawfully discriminated against the strikers when it terminated their employment if there were no vacancies on the very day they applied for reinstatement, but the Board also held that Laidlaw was discriminatorily motivated when it failed to reinstate the economic strikers when vacancies occurred after February 11.

In its decision, the Board said, "Moreover, we find in accord with the Trial Examiner, that Respondent [Laidlaw] was in fact discriminatorily motivated when it implemented its avowed policy of not considering the strikers once they had been replaced or if no vacancy existed on the date of application." This finding is supported by substantial evidence.

Although all the strikers unconditionally asked to return to work immediately, the company continued to advertise for and hire new workers. At the time of the hearing, approximately fifty new workers had been hired to fill vacancies resulting from employee turnover. There is no showing that these fifty openings could not have been filled by striker-applicants.

But more important on this issue was the company's announced attitude toward the union members before the strike. Two days before the strike, foreman Krile told employee Lempke that he had orders to replace the four or five union members in his department. On the day of the strike, plant manager Johnston read the speech to employees in which he emphasized that if they went on strike and were replaced, they would "lose forever" their right to employment by the company. And during the strike, Johnston told foreman Bridges that they should replace strikers "as fast as we can" so that they could get rid of the "troublemakers."

This evidence, when considered with the fact that not one striker who had been replaced was recalled and in light of the company's advertising for permanent unskilled help and its hiring of approximately fifty new employees to fill vacancies, is sufficient to establish a prima facie showing of unlawful motive. The company failed to offer any reason for preferring new workers as opposed to strikers. For these reasons, the finding of unlawful motive must stand.

We are also convinced that the record, when considered as a whole, warrants the Board's finding that Laidlaw violated section 8(a) (1) of the Act by threatening employees prior to the strike that if they struck they would be replaced and

---

3. The union representative's request was sufficient to constitute an offer on behalf of each striker. NLRB v. Brown & Root, Inc., 203 F.2d 139, 147 (8th Cir. 1953).

4. The employer argues that our decision in Sax v. NLRB, 171 F.2d 769 (7th Cir. 1948), is controlling here. To the extent that case is applicable, we view it as inconsistent with the Supreme Court's subsequent *Fleetwood* decision.

would forever lose their employment rights and by its maintaining a rule which prohibited circulating petitions or printed matter of any kind on company premises.

■ Laidlaw's final contention relates to the scope of the Board's order. It argues that even if the Board's holding is correct, the imposition of back pay liability is improper because the revised Board policy is being applied to conduct which was lawful at the time the conduct was performed. In support of its position, the company cites section 10(e) of the Administrative Procedure Act which requires the reviewing court to set aside agency action which is arbitrary, capricious or an abuse of discretion. It also refers us to a number of decisions, including NLRB v. E & B Brewing Co., 276 F.2d 594 (6th Cir. 1960); NLRB v. Guy F. Atkinson Co., 195 F.2d 141 (9th Cir. 1952); and NLRB v. Local 176, United Brotherhood of Carpenters, 276 F.2d 583 (1st Cir. 1960). These cases stand for the proposition that in certain situations the Board's adoption of a new rule or policy may not be applied retroactively where its practical effect is to create a hardship on the employer disproportionate to the public ends to be accomplished.

The Board maintains that remedial relief ordered in this case should stand. To justify retroactive relief, it cites the statement of the Supreme Court in SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947), to the effect that retroactivity "must be balanced against the mischief of producing a result which is contrary to a statutory design as to legal and equitable principles."

In the case before us, we believe that the importance of protecting the statutory rights of Laidlaw's employees outweighs the fact that the company may have relied on a prior Board rule or policy. We are in agreement with the statement made by the General Counsel in his brief: "Unless the disadvantaged strikers are compensated, they will have been penalized for exercising statutorily

protected rights and the effect of discouraging future such exercises will not be completely dissipated. In these circumstances, it was not arbitrary or capricious for the Board to conclude that complete vindication of employee rights should take precedence over the employer's reliance on prior Board law."

The Board's order will be enforced.

MAJOR, Senior Circuit Judge (dissenting).

My great respect for the ability of Judge Swygert to correctly solve difficult problems makes me reluctant to take issue with his well prepared opinion. However, I am so deeply convinced that the Board's request for enforcement of its order should be denied that I feel obliged to dissent.

In the first place, I agree that an important issue in the case is the effect to be given National Labor Relations Board v. Fleetwood Trailer Co., Inc., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614. The Board places great emphasis on that case, together with National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. *Fleetwood* was decided December 18, 1967, almost two years after the occurrence of the events here involved. *Mackay* was decided May 16, 1938, and now for the first time the Board gives it an interpretation radically different from that which it has pronounced in many cases, and from that given it by numerous courts.

More specifically, the Board and Judge Swygert rely upon these cases in support of principles that were unknown in the field of labor law at the time the incidents of the instant case took place. The Board at least tacitly so admits. On brief it states, "It is true that insofar as Brown & Root [132 NLRB 486 (1961)] deals with the subsequent rights of economic strikers whose positions are occupied by permanent replacements on the date they apply for reinstatement, it is contrary to the Board's decision in the case at bar. Indeed, the Board herein overruled that case and others of like

import, finding them inconsistent with the Supreme Court's decision in Fleetwood." Again it states, "In the light of Fleetwood, the Board felt called upon to reappraise certain prior decisions which held or implied that economic strikers' employment status terminated if permanent replacements occupied the job on the date the strikers applied to return to work. See, Brown & Root, Inc., et al., 132 NLRB 486 (1961), enforced, 311 F.2d 447 (C.A.8, 1963); Bartlett-Collins Co., 110 NLRB 395 (1954), affirmed, (American Flint Glass Workers', Union of North America v. NLRB) 97 U.S. App.D.C. 244, 230 F.2d 212 (1956), cert. den. 351 U.S. 988, 76 S.Ct. 1047, 100 L.Ed. 1501; Atlas Storage Div., 112 NLRB 1175, 1180, n. 15 (1955), enforced, (Chauffers, Teamsters & Helpers General Local No. 200, etc. v. N. L. R. B.) 233 F.2d 233 (C.A.7 1956). [In the last named case this court affirmed the Board's decision. To the same effect is our decision in Sax v. National Labor Relations Board, 7 Cir., 171 F.2d 769, hereinafter quoted.] In the case at bar, the Board unanimously concluded that those cases conflicted with the underlying principles of Fleetwood and the prior decisions were overruled." The Board could have named many other of its own decisions, as well as numerous court decisions, some of which I shall subsequently supply, which it now repudiates.

Assuming, contrary to what I believe, that *Fleetwood* is controlling, my mind rebels against imposing upon an employer a huge penalty for failure to anticipate what the Supreme Court might hold at some time in the future. Moreover, I doubt if this court has reviewed the record in a labor case where the employer under the advice of knowledgeable counsel so scrupulously adhered to the law as taught by the Board and the courts.

Judge Swygert briefly reviews the factual background and the negotiations which took place between the company and the union, which culminated in the strike of January 12, 1966. There is much to be added to this résumé, particularly in view of the Board's reliance upon the company's alleged anti-union motivation. The fact is, as shown by the Trial Examiner's report, there was not a scintilla of proof of any anti-union motivation by Laidlaw, or even of unfriendly relations between the parties from the time the union was certified as the bargaining agent. The strike, characterized as economic as it no doubt was, could also be described as ill advised in view of the union's failure to prove the charges given as a reason for the strike.

The main charges which the union preferred in justification of the strike were (1) that the company refused to bargain with the union in good faith, and (2) that the company discharged Carmon Brown, vice president and principal bargainer for the union, on December 7, 1965, because of his union activities. The Examiner dismissed both allegations and stated that the general counsel had failed in his burden of proof to show that the company failed to bargain in good faith and, as to Brown, stated, "I am convinced that the record warrants a finding that there is nothing more than suspicion to sustain that allegation."

The Examiner in exonerating the company on the charge of unlawfully discharging Brown, made a statement which, though lengthy, is worth repeating. It is important because it goes far to dispel the Board's premise of the company's anti-union motivation. The Examiner stated:

"The Respondent and the Union had been operating under collective-bargaining agreements since 1962. As of the time of Brown's discharge [December 7, 1965], the record discloses no antiunion conduct by Respondent or any unfriendly relations between the parties since the Union's certification in 1962. * * * There is no showing of any union animus directed specifically against Brown or that Brown's Union position and protected Union activities, which admittedly were known to Respondent, were resented or looked upon with disfavor or regarded as be-

ing obnoxious. On the contrary, despite Brown's well known Union position and activities, he was promoted to the position of foreman and offered a private tutor, with one half the cost to be borne by Respondent, to bring his educational level up from the 5th to the 8th grade. There is not one iota of evidence to indicate that Brown was made a foreman in order to get him out of the Union and the bargaining unit, and the General Counsel makes no contention to the contrary. Even after he had ceased being a foreman and again became a rank-and-file employee, when it would be reasonable for Respondent to expect him to rejoin the Union and resume his union activities, he was still offered a private tutor, with the full expense to be borne by Respondent, to up-grade his education."

It seems appropriate to consider the numerous incidents which gave rise to the various issues in the case, in the order of their occurrence. This takes me immediately to the Board's finding that the company violated Sec. 8(a) (1) of the Act by its pre-strike threats. The company is entitled to have this issue considered in connection with its splended, amiable relationship with the union and its employees, as so eloquently portrayed by the Trial Examiner. I take the following facts concerning this issue from the Board's brief.[1]

On January 10, 1966, the company was notified by the union of its intention to strike. On that date foreman Buttram "talked union all day" with employees Durham and Scotten, and asked them "what [they] were going to do" and "when." (The Board and the Examiner overlooked the testimony of Durham that in that conversation Buttram said nothing either for or against the union.) Also on that day foreman Krile told employee Lemke that he did not know that Lemke belonged to the union. Krile added that he "didn't think there was enough that belonged to the union that could do

any good, there were only four or five in his department that belonged to the union and he had orders to replace them." On January 11, foreman Krile told employee Good, "It won't do you a damn bit of good to go [on strike] because by the very next morning every damn one of you will be replaced."

That afternoon, plant manager Johnston read a statement prepared by the company's attorney to about 75 or 80 of the company's employees gathered in the lunchroom. Both the Board and Judge Swygert quote only a part of Johnston's statement. Even at the expense of prolixity, I think it should be set forth in its entirety. It follows:

"1. We are advised a Strike by some employees will begin at noon tomorrow.

"2. Under our Contract terms and under Federal Law any of you who want to may go on Strike tomorrow, BUT ONLY TO OBTAIN A CHANGE IN WAGE RATES.

"3. Also, under the Contract and the Federal Law, any of you who want to work instead of Striking have a right to work, and the Union cannot interfere with your right to work.

"4. The Mayor of Peru and Police Department have promised to provide ample police protection as needed.

"5. The Company has decided to continue to operate through the strike, and in doing so will provide work for all employees who decide to work and will hire new employees to replace those on strike.

"6. Mr. Wentz has told those of you at the Union meeting last Saturday that our attorney Mr. Duck lied to you on last Friday when he told you that under Federal Law if you do go on Strike and the Company hires a replacement for you you *Lose Forever* your right to employment by this company. I want to assure you that such

---

1. Some of the statements made by the company's foreman were denied, but the Examiner saw fit to credit the testimony of witnesses offered by the general counsel.

*IS* the law. Mr. Duck told you the absolute truth. Let me suggest that before you take action that can seriously and permanently effect your future here, you check with any lawyer of your own choice, or with the Indianapolis Office of The National Labor Relations Board. You will find Mr. Wentz has misled you and Mr. Duck has told you the absolute truth.

"7. Please know, it is *not* the desire of this company to have a strike. It is NOT the desire of this company to be forced into the necessity of replacing any of you in your job here with someone new, and so losing you as a part of Laidlaw. It is *NOT* the desire of this company to withhold from you any wage increase or other benefit which the company operations will permit giving. It is *NOT* the desire of this company for you to suffer a loss of income and, perhaps a loss of *job* to discover that what I am telling you is true.

"BUT THAT IS FOR YOU TO DECIDE TOMORROW.

"If any of you have any questions, I will be happy to answer them now, or, if you prefer, you may contact me at your convenience in the office later. "Thank you."

Both the Examiner and the Board place great emphasis on the phrase, "you *Lose Forever* your right to employment by this company," as showing that Johnston's statement was an incorrect statement of law. This contention is made notwithstanding that the Board and the courts in decisions subsequently cited have held that under such circumstances the employment status is permanently terminated. Any difference between informing an employee that he loses forever his right to employment and telling him that his status as an employee is permanently terminated is not apparent to me.

The Board's contention that these statements were threatening and coercive is bottomed on the premise that the em-

ployees were not properly advised as to the law and, therefore, were likely to discourage protected activity. In support of this contention it cites only Dayton Food Fair Stores, Inc. v. National Labor Relations Board, 6 Cir., 399 F.2d 153, 154, 155, and Shattuck Denn Mining Corp. v. National Labor Relations Board, 9 Cir., 362 F.2d 466, 471. Neither case is in point. In both, the court held as unfair a statement by the employer to his employees, that if they participated in a strike their jobs would be automatically terminated.[2]

In my view, Johnston's statement, prepared by his attorney, was a correct statement of law as it pertained both to the employer and the employees. His statement, friendly in nature, was read to a group of employees and certainly was sufficient to dissipate any unfair inference which might be drawn from the isolated statements of the two foremen made to two individual employees. While those statements were phrased in rather crude language, in substance they were the same as contained in Johnston's statement. The fact is that Johnston gave the employees sound advice when he suggested that if they did not believe that he was correctly stating the law they should consult with a lawyer of their own choice or with the Labor Board. If this advice had been followed, the unfortunate situation with which we are here concerned in all probability would never have developed.

I would reject the Board's finding that Johnston's speech and the statements made by supervisory employees were violative of Sec. 8(a) (1) as not supported by substantial evidence.

I shall cite and quote from Labor Board and court decisions which in my opinion completely demolish the Board's contention on this point. These cases are also pertinent to other issues subsequently discussed.

Suppose the employees had gone to the Labor Board for advice, as Johnston suggested. The Board could have responded

---

2. *Dayton* was decided subsequent to the decision of the Supreme Court in *Fleetwood* and will be referred to later.

by citing its own decisions as to the rights of the parties.

In Brown & Root, 132 NLRB 486, 494 (1961), the Board held:

"Like the Trial Examiner, we are constrained to hold the evidence presented by the General Counsel insufficient to establish that vacancies were available when the IAM strikers applied to Respondents for employment. *Moreover, we reject the theory urged by the General Counsel, to the effect that the 13 IAM strikers were entitled to appropriate vacancies as they arose. * * * We hold that Respondents had no obligation to seek out or prefer the IAM Strikers for vacancies which opened up after their application.*" (Italics here and later supplied unless otherwise noted.)

In Hot Shoppes, Inc., 146 NLRB 802 (1964), the employer told the employees on several occasions that in the event of a strike they all would be *permanently* replaced. The employer accepted and processed employment applications with a view to replacing the possible strikers. Ten such employees arrived prior to the commencement of the strike, which began January 4. On January 5, the employer hired seventeen new employees; on January 6, one, and on January 7, fourteen. These new hires filled the company's requirement for employees. The Trial Examiner found, as did the Trial Examiner in the instant case, that the strike was converted into an unfair labor practice strike by the employer's expeditious replacement of the strikers. The Board rejected the Trial Examiner's finding and held (page 805):

"We, however, disagree with the Trial Examiner's premises that an employer may replace economic strikers only if it is shown that he acted to preserve efficient operation of his business. The Supreme Court's decision in Mackay Radio & Telegraph Company, and the cases thereafter, although referring to an employer's right to continue his business during a strike, state that an employer has a legal right to replace economic strikers at will. We construe

these cases as holding that the motive for such replacements is immaterial, absent evidence of an independent unlawful purpose. Therefore, we reject the Trial Examiner's conclusion that the plan to replace the economic strikers here was itself improper and that the strike was converted to an unfair labor practice strike on January 4 by Respondent's implementation of such plan."

In Texas Boot Mfg. Co., 143 NLRB 264, 265 (1963), the Board considered a statement made by an employer to his employees and held that it was not violative of Sec. 8(a) (1) of the Act. The statement was as follows:

"So I want you to know that I am not going to close down this factory one day, because of a strike called by the Union. We will continue to operate and hire new workers. This simply means that when I employ new people to cross the picket line to work here at Texas Boot that strikers have lost their jobs *permanently*. I don't think it necessary for me to tell you how many unemployed people there are in Tennessee, Wilson County and Lebanon, who would like to have a job at our plant. We have several hundred applications on file now."

In James Hotel Co., 142 NLRB 761, 764 (1963), the chairman of the company's board told its employees that if "we voted union and had a strike, * * * they could replace us and hire help in our place," and that "*when the strike was over we would come back and have no jobs, because the other people * * * would have our jobs.*" The Examiner found that the speech was violative of Sec. 8(a) (1). The Board reversed the Examiner and held that the remarks were only a statement by the employer of its lawful right to hire replacements in the event of an economic strike.

In Aladdin Industries, Inc., 147 NLRB 1392, 1399 (1964), the company president told the employees that a strike would allow the company to replace the strikers *permanently*, that the company would do this in order to continue operations, and

that it had over 1,000 applications for employment in its files at that time. The Board affirmed the Trial Examiner's determination that the speech did not constitute restraint and coercion and was permitted by Sec. 8(c) of the Act.

If the employees or the union had consulted a lawyer of their own choice, as Johnston suggested, he would have found at least two decisions of this court which are dispositive of every major contention advanced by the Board in this case. Sax v. National Labor Relations Board, 7 Cir., 171 F.2d 769, and Chauffeurs, Teamsters and Helpers "General" Local No. 200 v. National Labor Relations Board, 7 Cir., 233 F.2d 233. In Sax, this court stated (page 771):

"The employees went on strike under the belief that Ann Killam had been wrongfully discharged. In this they were mistaken, and they cannot visit their mistake upon their employer. The petitioner, as was his right, filled all the vacancies created by the strikers quitting; and at the time the strikers unconditionally applied on March 12 for reinstatement, there were no vacancies. *The strikers had lost their status as employees of the petitioner, and the petitioner had a right to fill their vacancies.* National Labor Relations Board v. Mackay Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. *Thereafter the strikers stood at the gate of the petitioner on the same footing as anyone else seeking employment,* with this exception. The petitioner could not refuse to hire them or could not discriminate against them because of their having engaged in the concerted activity of the strike."

This appears to be an appropriate point to refer to the company's refusal to reinstate William Massey. Judge Swygert has stated the facts relevant to this matter. It is sufficient to note that Massey, one of the strikers, applied for reinstatement on January 14, which was denied by the company on the basis that his job had been filled. On January 18, the job became vacant and the company requested him to return to work at the same pay but as a new employee. Massey refused to go back under those circumstances and continued to participate in the strike. The Examiner found that the company's refusal to reinstate Massey on January 14 was proper but that its refusal to offer him full reinstatement on January 18 was violative of Sec. 8(a) (3) of the Act. The Board agreed with the Examiner.

Our decision in *Chauffeurs, supra,* on both its facts and the law reads as though it was written for Massey's situation. In that case the Trial Examiner held that an employee named Rodig, an economic striker, was entitled to reinstatement when, three days after his initial application for reinstatement, the employee who had replaced him was injured and could no longer work. The employer advertised for and hired a new employee without notification to Rodig. The Board reversed the Trial Examiner and held that the employer was under no duty to recall Rodig on the date of his replacement's injury or *any time thereafter.* We sustained the Board and in so doing held (233 F.2d page 238):

"As Rodig's employment was properly terminated when he applied for reinstatement, Atlas' duty toward Rodig did not require seeking him out but merely refraining from discriminating against him should he request new employment. However, he never made any such request. [Citing Mackay, 304 U.S. 333, 346, 58 S.Ct. 904.]"

Thus, the great body of the law fashioned by the Labor Board time and again, year in and year out, as well as the decisions of this court, are cast aside solely on the basis of the Supreme Court's decision in *Fleetwood,* decided long after the occurrence of the events in controversy.

This brings me to February 10, 1966, when fifty of the striking employees met and voted to abandon the strike and return to work. The next morning union representative Rains and about forty strikers appeared at the plant, seeking reinstatement. Rains informed plant manager Johnston of the action taken the previous night and handed him a sheet of paper which outlined the decision. Addi-

tionally, each of the employees present tendered to Johnston a printed form letter stating, "On January 12, 1966 I, along with some 70 other Laidlaw employees, went on strike in protest of certain unfair labor practices. As of this date I am unconditionally offering to return to work immediately. Please advise me immediately."

Following a telephone conversation with the company's attorney, Johnston read the following statement, "Many of you have been permanently replaced and are not entitled to reinstatement. As soon as we can determine if there are job openings today, those of you for whom there are such openings, if any, will be notified on or before Monday to report to work." At that time Rains emphasized to Johnston that "our unconditional offer to return did apply to all of the members of the local union."

The company determined that as of February 11, all but five of the strikers had been replaced and, hence, only five employees were needed to bring the work force up to pre-strike levels. Thus, on that date five of the striking employees were notified by telegram of the vacancies and offered reinstatement. The Examiner found and the Board agreed that at the time of the request for reinstatement on February 11, all strikers' jobs, except five, were filled by replacements who were assured of permanent status and that the company's failure to offer reinstatement to all of the strikers on that date was not violative of the Act.

The Examiner found:

"When the strikers were not reinstated after their application of February 11, they resumed their strike and picketing activity, with reinstatement obviously becoming the immediate objective of the strike.'

The Examiner in his report refers to this strike as a continuation or resumption of the original strike. This is a fallacious idea. There were two separate and distinct strikes, with entirely different objectives. The first, characterized as economic, was legal, and the second was sole-

ly for the purpose of forcing the company to reinstate all strikers, irrespective of the fact that all but five of the jobs had been filled by permanent employees. As recognized in the Board's brief, "The Company was thus confronted with a demand by all of the employees for reinstatement."

What was the obligation of the company when confronted with the union demand that all strikers be immediately reinstated to their former positions when all but five of such positions had been filled by permanent replacements? Pronouncements of the Board in effect at that time furnish the answer.

In Tex-Tuft Products, Inc. and Textile Workers Union of America, 134 NLRB 1628, 1631, the Board stated:

"* * * it is well settled that where, as here, economic strikers seek reinstatement, the employer is required to rehire only those who have not already been permanently replaced, and need not rehire even the unreplaced strikers if they condition their application on the reinstatement of those who have been replaced."

In American Optical Company and United Optical Workers Union, 138 NLRB 681, the union at the end of an economic strike made an offer on behalf of all twelve of the company's striking employees to return to work as a group. The company had already hired permanent replacements for some of them. The Board stated (page 682):

"* * * we find it sufficient that, at the time all 12 strikers offered to return to work, the Respondent had hired permanent replacements for *some* of the 12, and that the Respondent therefore was not obliged to take back all 12 strikers."

Under these pronouncements of the Board, the company was under no obligation to comply with the union's demand in whole or in part. However, in keeping with its long established record for fair dealing with its employees and the union, the company decided on a program by which it would reinstate employees on an

individual basis as vacancies occurred. For this purpose the company's personnel manager was instructed to check at regular intervals the company's employment status and its need for additional personnel, if any, and to report back to Johnston. This program was followed for several days. The Examiner stated:

"As previously found, the 16 strikers who were reinstated or offered reinstatement after February 11, 1966, either continued or rejoined the strike because of Respondent's conduct in terminating and *failing to reinstate the remaining strikers after their unconditional request for reinstatement.*" [3]

The company's effort proved fruitless for the reason that individuals refused to accept reinstatement unless the company complied with the union's unconditional demand made on February 11, which was a continuing one, that all strikers be reinstated or none would accept. Reference to a few of the numerous incidents which support this statement and which show the predicament facing the company seems pertinent.

Of the five employees who accepted reinstatement as of February 11, at a time when the Board concedes the company was in compliance with the law, one, Harold Stone, was a witness for the general counsel and testified that he accepted the offer of reinstatement, worked four days, then with eleven other employees quit and returned to the strike.

On February 15, five striking employees were offered reinstatement and four accepted, including Eva Whitaker who had been active in the union. On February 18, she was discharged, and it was charged by the union that the company was discriminatorily motivated because of her union and strike activity. The Examiner in his report concluded that there was no creditable evidence that her discharge was discriminatorily motivated. This is another of the many reckless charges which the union made but ways not able to prove.

Of the three employees who were offered reinstatement on February 16, one accepted, and two refused and rejoined the picket line.

On February 21, the company found it had four vacancies and offered reinstatement to four employees, all of whom refused. Among these was Marilyn Stapleton who testified as a witness for the general counsel that she was offered reinstatement but that "Ann Loe called for four of us" and advised the company that they would not return to work. Instead, she returned to the strike. Ann Loe testified for the general counsel and stated that she refused reinstatement which was offered her and that she notified the company on her own behalf and for three others.

On February 20, eleven employees who were supposed to go to work the following morning met with union representative Rains who told them "that they had the right to file unfair labor practice charges based on the termination of union members and that if they did not wish to return to work, they did not have to do so." Rains testified that they reached an agreement that "we would remain on strike, go on strike under the sign of an unfair labor strike." He testified that prior to that time the union's picket signs merely read, "on strike," but after that they read, "on strike protesting unfair labor practices." This change, so he testified, went into effect at midnight February 20.

The Examiner found that beginning Monday, February 21, "a group of 16 joined the remaining strikers in the picketing with signs which for the first time stated that the Union was 'on strike protesting unfair labor practices.'"

The Examiner's conclusion that the second strike was an unfair labor practice strike is, if a question of law, erroneous and, if one of fact, clearly without support. Even the union, as shown by the testimony of Rains, did not regard the strike as such until February 21. On a

---

3. The company asserts that twenty-two strikers were offered reinstatement, but for my purpose the exact number is not important.

factual situation almost identical with that here, the Examiner in *Hot Shoppes, Inc., supra,* found that an economic strike was converted into an unfair labor practice strike. The Board rejected this finding by the Examiner.

In his report the Examiner stated:

"A valid unconditional request for reinstatement was made by the Union on behalf of all strikers on February 11, 1966, despite the fact that not all the strikers submitted individual applications at that time or thereafter. As the Board recently stated, 'under settled law, it is well within the Union's authority, as the employees' bargaining agent, to make an unconditional application for reinstatement on behalf of the strikers * * *.'"

I do not question the authority of the union to make an application on behalf of all of its members, but its demand on February 11, that the company reinstate all strikers immediately, was illegal because its allowance would have required the company to violate the obligation which it owed to those who had been hired as replacements.

The Examiner found and the Board argues that the demand on February 11 for immediate unconditional reinstatement of all strikers was a continuing application for reinstatement as vacancies occurred.[4] This same contention as to continuity was advanced by the Board in Sax v. National Labor Relations Board, 7 Cir., 171 F.2d 769, and in response thereto this court stated (page 771):

"The Board's ruling would dispense with application at the time of a vacancy by the fiction of continuing application. An application when there was no vacancy cannot be used to do duty when a vacancy does occur, in the absence of a clear understanding by the employer that the application was to be considered a continuing one. The record here indicates that the petitioner had no such understanding."

Assuming, however, that the demand of February 11 was continuing, it was the same demand, that is, that the company reinstate all strikers irrespective of when or in what manner vacancies occurred. There never was a time when the company was obligated to meet such a demand. At the very most, the company was obligated to reinstate strikers only as vacancies occurred. No such unconditional demand was made by the union or by individual employees. The sole objective of the strike, as in effect found by the Examiner, was to force the company to reinstate all strikers. This explains and is consistent with the action of employees who were offered reinstatement as vacancies occurred. Some of such employees accepted, worked a few days and quit; others refused to accept an offer of reinstatment. Some of such employees joined the picket line, and all had as their objective support for the strike. Thus, the individuals aided and abetted the objective of the union to require the company to reinstate all strikers, or none would accept.

Faced with a dilemma created by a strike to enforce the union's illegal demand, and the attitude of individuals offered reinstatement who refused to work until such demand was met, what was the company to do when vacancies occurred? Surely it was not required to pursue further its good faith attempt to fill vacancies by offering reinstatement to strikers. If it desired to keep its business in operation, as it had a right to do, it pursued the only reasonable, logical and I think legal course open to it, that is, it advertised for and hired new employees.

In *Brown & Root, supra,* under circumstances less favorable to the employer than those here, the Board made a statement which is worth repeating:

"Moreover, we reject the theory urged by the General Counsel, to the effect that the 13 IAM strikers were entitled to appropriate vacancies as they arose. * * * We hold that Respondents had no obligation to seek out or prefer the

---

4. This argument is based on the novel premise that the word "immediate" means "continuing."

IAM Strikers for vacancies which opened up after their application."

This brings me to a consideration of National Labor Relations Board v. Fleetwood Trailer Co., Inc., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614, and National Labor Relations Board v. Mackay Radio and Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. The Board utilizes most of its brief in an attempt to demonstrate that those cases are controlling of the instant situation. The issue in Fleetwood was a narrow one and the facts surrounding it were so widely different from those of the instant case as to make it readily distinguishable. The question was whether the strikers had been permanently replaced on the date they sought reinstatement. The court found that they had not been. In reaching this conclusion, the court held that facts occurring after the date of the employees' application to return to work, of which the company was aware when the employees sought reinstatement, should be taken into consideration in determining whether the employees had been permanently replaced. This is the only issue which was presented to the court, and the only issue which the court decided.

In Fleetwood, the employer during the strike had drastically reduced its production and, consequently, the number of its employees. At the end of the strike, six of the strikers applied for reinstatement but, while the jobs were there, they were not open at the moment; however, the company intended as rapidly as possible to increase production to its pre-strike level and to increase the number of its employees accordingly. Some two months later, instead of offering reinstatement to the six strikers, the company hired six new employees, which the court held was a violation of the Act.

The facts in the instant case are a far cry from those in Fleetwood. Here, all during the first and second strikes the company operated its business on a pre-strike level, and the number of its employees remained substantially constant. When the union on February 11 made its unconditional demand that all strikers be reinstated immediately, all but five of their places had been permanently filled and the company immediately reinstated strikers to those places. The Examiner found and the Board agreed that the company was in compliance with the Act at that time. The vacancies in dispute were those caused by the replacement employees leaving their jobs. More than that, the company was confronted with a second strike, the object of which was to require it to reinstate all strikers. Those employees who were reinstated or offered reinstatement refused to work until the strike objective was met. Obviously, the Supreme Court had no such factual situation in Fleetwood and, in my view, it is not controlling. Any doubt on this score is resolved by the court's statement in Fleetwood (389 U.S. page 379, 88 S.Ct. page 546):

> "In some situations, 'legitimate and substantial business justifications' for refusing to reinstate employees who engaged in an economic strike have been recognized. *One is when the jobs claimed by the strikers are occupied by workers hired as permanent replacements during the strike in order to continue operations.* NLRB v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345–346 [58 S.Ct. 904, 910–911, 82 L.Ed. 1381] (1938); NLRB v. Plastilite Corp., 375 F.2d 343 (C.A.8th Cir. 1967); Brown & Root, 132 N.L.R.B. 486 (1961)."

Notwithstanding the court's approval of the cited cases, the Board now rejects its decision in *Brown & Root* and many others of like import. Even though *Mackay* is not mentioned in *Fleetwood* other than above noted, the Board uses *Fleetwood* as justification for an interpretation of *Mackay* which is far different from that given it by the Board and the courts, including this court, in many cases over a period of thirty years.

In my opinion, the Board has misused both *Fleetwood* and *Mackay*. Two cases decided since *Fleetwood* so indicate. The Sixth Circuit, in Dayton Food Fair

Stores, Inc. v. National Labor Relations Board, 6 Cir., 399 F.2d 153, 154, stated:

"While it is clear that an employer may permanently replace economic strikers, he may not fire a striking employee unless a permanent replacement has been employed. N. L. R. B. v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). Following an economic strike, employees are entitled to return to their jobs unless 'legitimate and substantial business justifications' dictate otherwise."

The Fourth Circuit, in National Labor Relations Board v. Stevenson Brick and Block Company, 393 F.2d 234, 239, stated:

"As economic strikers, employees are entitled to reinstatement unless permanent replacements have been hired during the strike. If vacancies remain, they must be filled from the ranks of the strikers without anti-union discrimination. NLRB v. Mackay Radio & Telegraph Co., supra. In the absence of any evidence or even a claim that the jobs sought by these strikers were still open at the time they requested reinstatement, see NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1968), that portion of the Board's order requiring reinstatement will not be enforced."

Even the Board, in a decision following Fleetwood, Hill Engineering, Inc., 171 NLRB 75 (1968), cites Mackay for the statement, "A striking employee retains his employee status and is entitled to reinstatement to his job absent persuasive evidence of permanent replacement."

I need do little more than mention the Board's theory that in any event it is entitled to enforcement of its order on the ground that the company had an anti-union motivation for failing to reinstate the striking employees. In support of this point the Board on brief states, "This alternative holding, unlike the application of Fleetwood discussed, supra, involves no change in the law but rather invokes the traditional doctrine that strikers whose employment status has been terminated, like all new applicants for employment, are entitled to be considered on a nondiscriminatory basis." Cases cited in support of this point, such as Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271, and National Labor Relations Board v. Albritton Engineering Corp., 5 Cir., 340 F.2d 281, involved situations where the applicant for employment had never been an employee or, if he had, his employment had been terminated. There is no merit in this contention. The short answer to the Board's argument on this point is that not a single striker made application to be re-hired; their applications in each instance were for reinstatement. As was stated in National Labor Relations Board v. Textile Machine Works, Inc., 3 Cir., 214 F.2d 929, 933, the company "could not be guilty of unfair labor practices in refusing the employees something which they had not in fact asked for." All individual applications for reinstatement were conditional, as previously shown, and any finding that the company had an anti-union motivation relative to the reinstatement of the strikers has no substantial support.

With due regard for our limited scope of review, I would deny in toto the Board's request for enforcement of its order. Even if I could agree that the Board's reliance on Fleetwood is proper, I still would refuse enforcement of that portion of its order which awards back pay. I assume, as the Board argues, that it has the power to overrule its previous decisions and "retroactively to determine the merits of the dispute in which the new policy is announced." I further assume, as the Board states, that "there is no absolute rule precluding back pay based upon a retroactive application of a change in the law."

The Administrative Procedure Act, Title 5 U.S.C.A. Sec. 706, which defines our scope of review, provides:

"The reviewing court shall—

\* \* \* \* \* \*

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; \* \* \*."

The company cites numerous cases in which the courts have refused to enforce the Board's back pay order under circumstances similar to those here. National Labor Relations Board v. Majestic Weaving Co. Inc., 2 Cir., 355 F.2d 854; National Labor Relations Board v. E & B Brewing Co. Inc., 6 Cir., 276 F.2d 594; National Labor Relations Board v. Guy F. Atkinson Co. et al., 9 Cir., 195 F.2d 141, and others. As to these cases, the Board on brief states, "And while the Company correctly states that there are cases in which this provision [Administrative Procedure Act] has been applied to prohibit the imposition of remedial measures which are not simply prospective in effect where there had been a retroactive change in the law, the Supreme Court has made it clear that each case must turn on its own facts."

I shall not repeat in detail the facts material to this point. As previously shown, the company under the advice of knowledgeable counsel scrupulously followed the law as taught by the Labor Board and the courts. This is particularly true as to the law relating to the rights of employer and employees when the latter at the end of a strike make application for reinstatement. The Board tacitly, if not expressly, so concedes. Some two years after the events in controversy took place, the Supreme Court rendered its decision in *Fleetwood*. In reliance on that case the Board announced a change in the law. I think it unconscionable under these circumstances that the company should be saddled with

a huge back pay order,[5] and this is so whether the Board's reliance on *Fleetwood* was proper or not.

Enforcement of the Board's order means from now on that an employer when faced with the problem of his rights and obligations in a labor dispute cannot safely rely on the advice of counsel, pronouncements of the Labor Board or court decisions for the law by which he should charter his course. Instead, he must be endowed with a power of prophecy sufficiently great to enable him to anticipate that the Board may change the law and make illegal that which was legal.

The Board's order in this respect is, in my judgment, clearly "an abuse of discretion" and, irrespective of all other considerations, I would deny its enforcement.

---

5. In oral argument it was stated by counsel for the company that under this order the company might be required to pay as much as $450,000.